# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 15-1011V
Filed: February 1, 2018
UNPUBLISHED

|  |  |
|---|---|
| AMRIT DHANOA,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*Maximillian J. Muller, Muller Brazil, LLP, Dresher, PA,* for petitioner.
*Ann Donohue Martin, U.S. Department of Justice, Washington, DC,* for respondent.

### **DECISION AWARDING DAMAGES**[1]

**Dorsey**, Chief Special Master:

On September 11, 2015, Amrit Dhanoa ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleged that she suffered an injury to her right shoulder, including adhesive capsulitis and shoulder injury related to vaccine administration ("SIRVA") caused in fact by the influenza ("flu") vaccine she received on August 19, 2014. Petition at 1, ¶¶ 3, 14. The case was assigned to the Special Processing Unit of the Office of Special Masters.

On October 10, 2017, the undersigned issued a ruling on entitlement, finding petitioner entitled to compensation for her SIRVA. Being previously informed that the

---

[1] When this decision was originally issued, petitioner was informed that the decision would be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). Petitioner was notified that she could seek redaction pursuant to § 300aa-12(d)(4)(B); Vaccine Rule 18(b). Petitioner did not request redaction. When this decision was initially filed on February 1, 2018, names and case numbers of other cases were referenced. The undersigned has since determined that it is appropriate to redact the names and case numbers of other cases cited by petitioner in her brief and discussed in this decision because information regarding those cases, although general in nature and used only to support the amount of compensation sought by petitioner in this case, did not appear in the decisions issued in those cases.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

parties had been unable to agree upon an appropriate amount of compensation in this case, the undersigned ordered the parties to file simultaneous briefs regarding the damages to be awarded.  For the reasons described below, the undersigned finds that petitioner is entitled to an award of damages in the amount of **$ 95,763.14.**

**I.      Relevant Procedural History[3]**

Respondent's concerns regarding the merits of petitioner's claim were first voiced by respondent's counsel during the initial status conference held on October 26, 2015.  Respondent reiterated these concerns in his Rule 4(c) report filed on December 9, 2015.  During the subsequent six months, petitioner filed additional proof and the parties attempted to reach an informal settlement.  The undersigned conducted a Rule 5 status conference on June 30, 2016.

After hearing from the parties, the undersigned presented her tentative findings and conclusions.  Specifically, she found that petitioner received the influenza vaccine in her right (injured) arm, that the onset of petitioner's injury was immediate, that petitioner's failure to mention her shoulder pain to her primary care provider two days after vaccination and to her dermatologist on visits in August and December 2014 was reasonable, and that petitioner's clinical course and diagnosis was consistent with SIRVA.  Rule 5 Scheduling Order, issued July 5, 2016, at 2-3 (ECF No. 25).  Thereafter, the parties requested a fact hearing which they believed was "necessary to reach a resolution."  Joint Status Report, filed July 27, 2016 (ECF No. 26).

The undersigned conducted a fact hearing in Dallas, Texas on December 8, 2016.  During the hearing, it became clear that some medical records were outstanding. *See* Post-Hearing Order, issued Dec. 8, 2016, at 1 (ECF No. 31).  Petitioner filed the additional medical records in January and February 2017.  *See* Exhibits 13-16 (ECF Nos. 34, 37, 40).

On March 20, 2017, the parties requested a written determination from the undersigned regarding several areas of disagreement: 1) the arm in which the vaccine was administered and 2) the onset of petitioner's injury.  Joint Status Report (ECF No. 41).  The undersigned issued a fact ruling finding the vaccination was administered in petitioner's right arm as alleged and her onset occurred within 48 hours.  (ECF No. 42).  In her ruling, the undersigned included a detailed discussion of the evidence presented and the parties' respective arguments.  She encouraged the parties to consider an informal resolution of the claim.  *Id.* at 7.

For several months, the parties engaged in informal settlement discussions.  At a status conference on July 7, 2017, they confirmed that the main area of disagreement involved the appropriate amount for petitioner's pain and suffering.  *See* Order, issued July 7, 2017, at 1 (ECF No. 46).  They discussed the options available if they could not informally resolve the case.  *Id.* at 1-2.

---

[3] A more detailed recitation of the procedural history in this case can be found in the undersigned's Ruling on Entitlement, *Dhanoa v. Sec'y of Health & Human Servs.,* No. 15-1011V which can be found on the court's website at www.uscfc.uscourts.gov (last visited on Jan. 30, 2018).

On August 7, 2017, the parties filed a joint status report requesting "that the Chief Special Master issue a decision determining whether Petitioner is entitled to compensation." Joint Status Report at 1 (ECF No. 47). They added that, if the undersigned determined petitioner was entitled to compensation, they anticipated she would be required to resolve the issue of damages. *Id.*

Having resolved the pertinent factual issues, the undersigned found that petitioner had met all of the criteria for a SIRVA. Although petitioner's claim was filed before SIRVA was added to the Vaccine Injury Table, and thus could not be found to be a SIRVA Table injury,[4] the undersigned's determination was informed by the criteria used to evaluate such claims.[5] She concluded that petitioner had met her burden of proving causation-in-fact under *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005).

The undersigned then ordered the parties to file simultaneous briefs detailing the amount of damages they believe is appropriate and providing arguments and documentation in support of these amounts. Damages Order, filed Oct. 10, 2017, at 1 (ECF No 49). Petitioner filed additional evidence on December 8, 2017 (*see* exhibits 17-19 (ECF Nos. 51-52)), and the parties filed their briefs on December 11, 2017 (ECF Nos. 54-55).

## II.    Relevant Medical History

Prior to receiving the flu vaccine on August 21, 2014, petitioner's medical history was significant for diabetes, heart problems, and several instances of a rash, but there was no evidence petitioner experienced any previous right shoulder pain. *See generally* Exhibits 2, 5-6. The day before vaccination, petitioner had seen a dermatologist, Dr. Steinmertz, for treatment of a rash she had been experiencing for months. Exhibit 7; *see also* Transcript ("Tr.") at 11. After vaccination, petitioner visited her primary care

---

[4] Originally, the effective date for the new rule was February 21, 2017. Revisions to the Vaccine Injury Table, 82 Fed. Reg. 6294 (Jan. 19, 2017) (to be codified at 42 C.F.R. pt. 100). This effective date was delayed until March 21, 2017. Delay of Revisions to the Vaccine Injury Table, 82 Fed. Reg. 11321 (Feb. 22, 2017) (to be codified at 42 C.F.R. pt. 100).

[5] The criteria are as follows:

> A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following: (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection; (ii) Pain occurs within the specified time-frame; (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

82 Fed. Reg. 6303 (Qualifications and Aids to Interpretation for SIRVA); *see also* National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, 80 Fed. Reg. 45132, Notice of Proposed Rulemaking, July 29, 2015 (citing Atanasoff S, Ryan T, Lightfoot R, and Johann-Liang R, 2010, *Shoulder injury related to vaccine administration (SIRVA)*, Vaccine 28(51):8049-8052).

physician ("PCP"), Dr. Naghmi,[6] complaining of this rash. Exhibit 2 at 7. Although petitioner described her pain level as five on a scale of ten at this time, she testified that she did not mention the pain during this visit because she believed that level of pain, two days after vaccination, was normal. Tr. at 12-13. Similarly, petitioner did not report her pain during visits to another dermatologist, Dr. Aponte, whom she saw on August 28 and September 30, 2014, for her rash. *See* Exhibit 8. Petitioner testified that, despite an increase in pain level to seven, she did not mention her arm pain to Dr. Aponte because she was a dermatologist. Tr. at 16-17. Petitioner testified that she also experienced a decrease in her range of motion ("ROM") at this time. Tr. at 18-19. During the fact hearing, the undersigned clarified that petitioner had been prescribed prednisone for her rash in both August and September 2014. Tr. at 83-85.

On October 31, 2014, Ms. Dhanoa visited her PCP, complaining of pain in her right shoulder for six weeks. Pet. Ex. 13 at 1.[7] The medical record states that Ms. Dhanoa had "joint and muscle pain" and that her "ROM [was] mildly painful for right shoulder." *Id.* The medical record from that visit does not contain a diagnosis, but Dr. Naghmi did order x-rays. *Id.* at 2. Additionally, it appears Dr. Naghmi referred petitioner to an orthopedist, Dr. Klein. *See* Exhibit 4 at 16;[8] Tr. at 25-26.

At the fact hearing, petitioner took issue with Dr. Naghmi's description of her pain as "mild," claiming she would not have sought medical treatment if that had been the case. Tr. at 77-78. She testified that her level of pain was nine out of ten and that Dr. Naghmi informed her she was suffering from frozen shoulder. Tr. at 19, 24, 77-78. She further testified that her injury began to impact her daily life, making it difficult to open a car door, use the computer, perform household chores, and swim. Tr. at 24-25.

Petitioner first saw Dr. Klein at Orthopedic & Sports Medical Center on November 24, 2014, complaining of a "three-month history of decreasing range of motion, increasing pain in the right shoulder," after receiving the flu vaccine in August. Exhibit 4 at 16. Dr. Klein's evaluation revealed a "limitation of abduction to about 80 degrees," "marked limitation of internal and external rotation," and "pain and tenderness . . . with positive impingement signs." *Id.*; *see also id* at 17 (where these areas were marked as abnormal). Dr. Klein diagnosed petitioner with adhesive capsulitis and prescribed a home exercise program ("HEP"), formal physical therapy ("PT"), and a course of Mobic. *Id.* at 16, 18. Petitioner described her pain level as nine and one-half to ten and one-

---

[6] At this visit, petitioner saw Dr. Rifat Naghmi. During the fact hearing, petitioner explained that she sees two physicians, Drs. Rifat and Shubhi Naghmi, who are husband and wife. Together, they act as petitioner's PCP. *See* Tr. at 62.

[7] When the record from this visit was originally filed as part of exhibit 2, it appears the second page was omitted. *See* Exhibit 2 at 6; Tr. at 92. Petitioner later re-filed the record in its entirety. *See* Exhibit 13.

[8] This record also can be found in Exhibit 16. *Compare* Exhibit 4 at 16 *with* Exhibit 16 at 13. Both exhibits 4 and 16 contain medical records from Dr. Klein for visits occurring in 2014 and 2015. However, the disclosure form signed by petitioner on November 24, 2014, can be found only in exhibit 4. *See* Exhibit 4 at 9-10. Similarly, a more detailed checklist for the musculoskeletal examination performed on November 24, 2014, and medication log are included only in exhibit 4. *See* Exhibit 4 at 17-18. Exhibit 16 contains physical therapy notes which were not included in exhibit 4. *See* Exhibit 16 at 15-16. With the exception of the pages found only in exhibit 16, citation to these records will to exhibit 4. Dr. Klein's updated medical records, from 2016 through 2017, were filed as exhibit 15.

half at this time.  Tr. at 29.  Dr. Klein noted that petitioner was having trouble dressing and sleeping.  Exhibit 4 at 16.  At the fact hearing, petitioner testified that in addition to her earlier difficulties, she was now having trouble dressing and washing and combing her hair.  Tr. at 29.

From December 2014 through February 2015, petitioner visited Dr. Klein on a monthly basis.  *See* Exhibit 4 at 13-15.  In December 2014, Dr. Klein prescribed additional PT and an additional course of Mobic.  *Id.* at 18, 22.  The billing records submitted by petitioner show she attended thirteen PT sessions from December 3, 2014 through February 10, 2015.  Exhibit 14 at 1-4.  There is a prescription for additional PT dated February 10, 2015, but Dr. Klein did not specify the frequency of this PT.  Exhibit 4 at 21.  Additionally, there is no evidence to show that petitioner attended additional sessions in response to this prescription.  Exhibit 4 at 21.  Although she showed slight improvement in December 2014 and January 2015 (exhibit 4 at 14-15), in February 2015, Dr. Klein noted that petitioner was "not making much progress" (*id.* at 13).  Petitioner testified she had a pain level of ten during this time.  Tr. at 31.

On April 24, 2015, Dr. Klein noted that petitioner could not raise her right arm more than 40 degrees and was having trouble sleeping.  Exhibit 4 at 12.  He administered an injection comprised of "2cc of Kenalog and 2cc of 0.25% Marcaine plan" in petitioner's right subacromial space (*id.*) and prescribed additional formal PT *(id.* at 20).  Petitioner testified that the injection helped.  Tr. at 33-34.

In May and early June 2015, petitioner attended six PT sessions.  Exhibit 12 at 14-32.  At her session on June 9, 2015, she reported that she had little pain but "just can't move her arm."  *Id.* at 14.  She saw Dr. Klein again on June 18, 2015, reporting that her "pain [was] much better . . . [and] [s]he [was] able to sleep at night."  Exhibit 4 at 10.  Petitioner described herself as "a little better . . . but not fully recovered" at that time.  Tr. at 34.

After a six week gap, petitioner resumed formal PT in late July 2015, attending four sessions.  Exhibit 12 at 1-13.  On July 28, 2015, petitioner reported that she had improved since her last PT session "but still had difficulty reaching overhead or behind her back."  *Id.* at 9.  At her next session, she indicated she "was pretty sore after last session," describing most of her pain as occurring "at the tip of the shoulder blade and around the shoulder joint."  *Id.* at 7.  On August 11, 2015, petitioner stated that her pain "comes and goes. But her arm is stiff."  *Id.* at 5.  Two days later, she noted that she "was sore after last session, but feels better today."  *Id.* at 3.  On October 15, 2015, petitioner was discharged from formal PT because she "had not been seen in PT since 8/13/15 and has not returned phone calls to schedule future appointments."  *Id.* at 2.  Petitioner testified that she discontinued formal PT because she because "it was too much to keep going twice a week."  Tr. at 39.  She added that she began taking medication which helped and continued her HEP.  Tr. at 39-40.  Petitioner described her pain level as six out of ten at that time.  Tr. at 39.

Almost one year passed before petitioner returned to Dr. Klein on July 25, 2016.  Although there was "no change in character or location of problem," Dr. Klein recorded that "[t]here has been significant improvement in symptoms since last visit" with a pain

5

level of five and twenty percent improvement.  Exhibit 15 at 9.  He noted that the "[l]ast injection helped some" but reported that petitioner had "some tingling and numbness down to her arm at times and some more pain in the evening which prompted her visit." *Id.*  After examining petitioner, he noted that she "has just about full range of motion with pain at extremes" and equal gross motor and sensory reflexes.  *Id.* at 10.  Dr. Klein discussed the possibility of another cortisone injection if petitioner's pain worsened and she had trouble sleeping, but instructed petitioner to continue her HEP.  *Id.*

At the fact hearing in December 2016, petitioner characterized her shoulder as "much better" (Tr. at 40) and noted that her condition "had improved a lot" (Tr. at 81).  However, she indicated that her pain would return at times, for example when she drove for more than 30 to 40 minutes.  Tr. at 40.  She testified that she experienced pain "at least two or three times" per week and could no longer participate in activities she previously enjoyed such as swimming and Zumba dance classes.  Tr. at 41.  In response to questioning from the undersigned, petitioner demonstrated her current range of motion.  She showed she could raise both arms overhead and extend them in front of her, but could not move her right arm as far up as her left arm when placing it behind her back.  Tr. at 81-82.  Testifying that she had difficulty washing her left side, petitioner showed that she could not extend her right arm as far over her left shoulder as she could extend her left arm over her right shoulder.  Tr. at 82.

On July 18, 2017, petitioner saw Dr. Klein again.  At this visit, she reported that her symptoms had "worsened since last visit" but again rated her pain at five out of ten.  Exhibit 17 at 2.  Dr. Klein observed that petitioner lacked the last ten degrees of internal and external rotation and showed "[m]ildly positive impingement signs."  *Id.*  He described most of her pain and tenderness as occurring at the trigger point of the right rhomboid group and extending up to the trapezius (*id.* at 2) and opined that petitioner's condition was "more triggering pointing of the rhomboid . . .then [sic] . . . adhesive capsulitis" (*id.* at 3).  He prescribed another course of Mobic, went over some stretching exercises which should be performed daily, and emphasized the importance of staying well hydrated.  *Id.*

On November 22, 2017, petitioner visited a doctor in India who administered a cortisone injection and ordered an MRI which was performed the next day.  *See* Exhibits 18-19.  The results of the MRI show subacromial-subdeltoid bursitis, supraspinatus tendinosis, and degenerative changes.  Exhibit 18.

### III.     The Parties' Arguments

The parties have stipulated that petitioner is entitled to past unreimburseable expenses in the amount of $862.15.  Respondent's Brief ("Res. Brief") at 1 & n.2 (ECF No. 54); Petitioner's Brief ("Pet. Brief") at 1 n.1 (ECF No. 55).  Thus, the only issue before the undersigned is the amount of pain and suffering to be awarded.

Petitioner asserts that she is entitled to $100,000.00 for pain and suffering.  Pet. Brief at 1.  To support this claim, she maintains that she suffered excruciating pain in the months following vaccination, endured more than three years of pain and limited range of motion, and continues to experience pain and weakness.  *Id.* at 6-7.  Emphasizing that petitioner "was forced to visit a doctor while abroad in India" in late

6

2017, petitioner "believes that she will suffer permanent residual effects from her SIRVA injury." *Id.* at 7.  Petitioner claims that she still "experiences pain when driving and using a computer," noting that "[her] employment as a travel agent requires lengthy hours on the computer." *Id.*  Petitioner stresses that she still needs pain medication (Tylenol) and can no longer perform recreational activities such as "biking, gardening, swimming, and Zumba." *Id.*

Respondent argues for a lower amount, $75,000.00, for petitioner's pain and suffering.  Res. Brief at 1.  Emphasizing the mild nature of the pain and almost full range of motion experienced by petitioner in 2016, he maintains that petitioner suffered "pain and hardship for a period of about eleven months, from September 2014 through August 2015." *Id.* at 6.  Respondent attributes the setbacks experienced by petitioner to instances "when PT was not performed." *Id.*  Acknowledging that petitioner recently underwent another MRI and may have received a cortisone injection while in India, respondent suggests that "the November 23, 2017 MRI indicates that degenerative findings, unrelated to SIRVA, may be playing a role in [petitioner's] current condition." *Id.*

Both parties cite to other SPU cases involving SIRVA after receiving a flu vaccine in support of their claimed amounts.  Petitioner cites cases in which petitioners were awarded $85,000.00 to $100,000.00 for pain and suffering.  Pet. Brief 5-6.  The amount of $75,000.00 was awarded in all cases cited by respondent.  Res. Brief at 6-7.

IV.     Discussion

The evidence in this case shows petitioner suffered shoulder pain within 48 hours of receiving the flu vaccine on August 19, 2014.  Petitioner describes her level of pain initially as five on a scale of ten.  However, her pain level increased significantly, to nine and one-half or ten and one-half, by the time petitioner first saw Dr. Klein on November 24, 2014.

On November 24, 2014, Dr. Klein diagnosed petitioner with adhesive capsulitis, noting she had about 80 degrees of abduction.  Despite thirteen sessions of PT during December 2014 through early February 2015, petitioner's range of motion decreased to 40 degrees by her April 24, 2015 appointment.  This further reduction is evidence of the pain petitioner was experiencing.  Additionally, she reported difficulty performing basic tasks such as washing and combing her hair.

The record shows, however, that petitioner obtained significant relief from the injection she received on April 24, 2015 and ten PT sessions she attend thereafter.  Although petitioner continued to experience intermittent pain and a slight decrease in range of motion after August 2015, her condition did not deteriorate to the level of pain and limited movement she experienced in April 2015.  Moreover, petitioner has dealt with these more symptoms for more than three and one-half years.

The only case cited by the parties which involved an award not based an informal agreement is *Desrosier v. Sec'y of Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017).  In that case, the undersigned awarded $85,000.00 for pain and suffering to a petitioner who suffered a SIRVA after receiving

the tetanus, diphtheria, acellular pertussis vaccine in March 2015. *Id.*, at *1. A review of the facts in *Desrosier* reveals symptoms which were less severe than those initially experienced by petitioner in this case. For example, after approximately one month of formal PT, the petitioner in *Desrosier* indicated "[s]he was only experiencing pain with certain movements" and had improved range of motion and strength. *Id.*, at *2. A few weeks later, it was reported that the *Desrosier* petitioner had "full range of motion with discomfort on full flexion and abduction." *Id.* However, the petitioner in *Desrosier* was hampered by the fact that she was six months pregnant at the time of the vaccination. She was unable to avail herself of treatments which would have improved her condition such as pain medication, steroid injections, and surgery. Additionally, petitioner was attempting to work while caring for her one year old child and, after giving birth, her infant. The *Desrosier* petitioner suffered a relapse after giving birth and attempting to lift her one month old. *Id.*, at *3. In that decision, the undersigned stressed that the amount of petitioner's award was calculated in part to reflect petitioner's particular circumstances and limitations in treatment options imposed by her pregnancy. *Id.*, at *5. Although the circumstances in this case are different than those in *Desrosier*, the undersigned finds the amount awarded for pain and suffering in this case should be comparable to that in *Desrosier.*

The remainder of the cases cited involved awards based upon amounts agreed to by the parties.[9] While less informative than *Desrosier*, it is still helpful to consider the different amounts awarded in those cases. An examination of the cases cited by respondent strengthens petitioner's position that she should receive more than $75,000.00 in pain and suffering. For example, in one case, petitioner was prescribed Mobic and underwent formal PT, but required no injection. The facts in another case are similar to the instant case in that the petitioner was also diagnosed with adhesive capsulitis. However, that petitioner improved in less than one year, in response to one injection and fewer PT sessions than attended by the petitioner in this case.

Of the cases cited by petitioner, there is one with facts closest to the instant case*.* Like the petitioner in this case, the petitioner in that case participated in formal PT and received multiple injections. However, that petitioner required three injections which provided relief for approximately three weeks each time. Additionally, that petitioner underwent seven months of formal PT, and at one point considered the possibility of surgery. Petitioner in this similar case was awarded $95,000.00 in pain and suffering*.*

As part of her argument, petitioner in this case maintains that she continues to suffer the effects of her injury. She stresses that she was seen for shoulder pain as recently as November 2017, at which time she received a second injection. However, it is clear that petitioner's pain following the April 24, 2015 injection was significantly less than the pain she experienced previously. Additionally, her range of motion was much improved. To cover additional pain petitioner is likely to experience for the next year, the undersigned will award some compensation for future pain and suffering.

---

[9] These cases are being discussed without identifying information such as names and case numbers which have been redacted prior to posting.  See *supra* note 1.

Like the petitioner in this case, the petitioner who was awarded $95,000.00 for pain and suffering claimed that she continued to suffer the effects of her injury. Because the amount awarded was based on an amount agreed upon by the parties, the portion being paid for future pain and suffering as opposed to actual pain and suffering was not identified.

In this case, the undersigned awards $85,000.00 for actual pain and suffering and an additional $10,000.00 for future pain and for the year following this decision. The amount designated for future pain and suffering is reduced to its net present value, $9,900.99, using a net discount rate of 1%.  See § 15(f)(4)(A) (requiring a reduction to net present value for future compensation being currently paid); see also Neiman v. Sec'y of Health & Human Servs., No. 15-631V, 2016 WL 7741742, at *1 (Fed. Cl. Spec. Mstr. Oct. 31, 2016) (using a net discount rate of 1% for the first 15 years and 2% thereafter).

### V.     Conclusion

**For all of the reasons discussed above, and based on consideration of the record as a whole, the undersigned finds that $94,900.99 represents a fair and appropriate amount of compensation for petitioner's past and future pain and suffering.  In addition, the undersigned finds that petitioner is entitled to compensation for $862.15 in past unreimburseable medical expenses.**

Based on the record as a whole and arguments of the parties, **the undersigned awards petitioner a lump sum payment of $95,763.14 in the form of a check payable to petitioner, Amrit Dhanoa.**  This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[10]

**IT IS SO ORDERED.**

> s/Nora Beth Dorsey
> Nora Beth Dorsey
> Chief Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.